IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| SCOTT & WHITE MEMORIAL HOSPITAL, | § | |
| Plaintiff, | § | |
| v. | § | 6:17-CV-75-RP |
| AETNA HEALTH HOLDINGS, LLC, as successor by merger to COVENTRY HEALTH CARE, INC., et al., | § | |
| Defendants. | § | |

## ORDER

Before the Court is the report and recommendation of United States Magistrate Judge Jeffrey C. Manske, (Dkt. 96). Defendant ARM, Ltd. ("ARM") filed a motion to dismiss for failure to state a claim upon which relief can be granted. (Dkt. 26). The motion was referred to Judge Manske for findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72, and Rule 1(d) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas. Judge Manske entered a report and recommendation on February 28, 2018, (Dkt. 96), which recommends that the Court grant the motion. Plaintiff Scott & White Memorial Hospital ("Scott & White") timely filed objections to the report and recommendation on March 14, 2018. (Dkt. 108). Scott & White is therefore entitled to *de novo* review of the portion of the report and recommendation to which it has objected. *See* 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the report or specified findings or recommendations to which objection is made.").

1

# I. BACKGROUND

This case arises from a contract dispute. Scott & White, a health care provider, entered into a contract (the "Hospital Agreement") with Coventry Health Care National Network, Inc. ("Coventry"), a preferred health care provider network. Coventry creates this network with a series of contracts: hospitals and physicians on one side, and insurance companies, employer health plans, managed care organizations, and third-party administrators on the other. (Am. Compl., Dkt. 18, ¶ 21). The subscribers to the network receive access to preferred health care providers at discounted rates. (*Id.*). Scott & White agreed via the Hospital Agreement to provide health care services to Coventry network subscribers. In exchange, Coventry agreed to list Scott & White in its national provider network and to bind the network subscribers to pay for health care services provided by Scott & White. (*Id.* ¶ 23). Two other contracts—the Third Party Administrator Agreement ("TPA Agreement") and the Administrative Services Agreement—tie the remaining defendants into the network.

Scott & White contends that Tanadgusix Corporation Health & Welfare Trust (the "Trust") has underpaid at least thirty-nine health care claims arising from the care for a particular patient, totaling over $1.5 million. (*Id.* ¶ 6). Scott & White alleges that this failure to pay breached the contractual relationships between Scott & White and the various defendants. Scott & White brings claims for breach of contract against Coventry, and, in the alternative, ARM and the Trust. It also seeks a declaration that either Coventry, ARM, or the Trust is obligated to pay Scott & White for health care services provided to the patient at the rates set out in the Hospital Agreement.

ARM has moved to dismiss all claims against it on the ground that it is not in privity with Scott & White because it is not a party to the contract Scott & White signed (the Hospital Agreement) and Scott & White is not a party to the contract ARM signed (the TPA Agreement). ARM contends that these circumstances preclude Scott & White from asserting a contractual claim

against ARM. Scott & White points to cases applying Texas law finding that under certain circumstances, different documents signed at different times can be read together as one agreement. ARM has countered that (1) Illinois law applies to the question of whether a contractual relationship exists between Scott & White and ARM (because the TPA Agreement includes an Illinois choice-of-law provision), and under Illinois law multiple documents cannot be considered parts of the same agreement when they were entered into at different times; and (2) even if Texas law applied, the cases relied upon by Scott & White to support its contention that the series of contracts at issue give it the right to bring a breach-of-contract claim against ARM are distinguishable from the facts of this case. Judge Manske recommends granting the motion to dismiss.

## II. LEGAL STANDARD

*A. Federal Magistrates Act*

Under federal statute and the Federal Rules of Civil Procedure, magistrate judges may make findings and recommendations on dispositive motions. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b)(1). Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are dispositive motions under the Federal Magistrates Act. *Davidson v. Georgia-Pac., L.L.C.*, 819 F.3d 758, 763 (5th Cir. 2016) (citing 28 U.S.C. § 636(b)(1)(A)). Parties are entitled to *de novo* review of any part of the magistrate judge's recommendation that has been properly objected to. Fed. R. Civ. P. 72(b)(3).

*B. Federal Rule of Civil Procedure 12(b)(6)*

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion to dismiss, the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (citation and internal quotation marks omitted). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the [plaintiff's] grounds for entitlement to relief—including factual

allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570); *see also In re Katrina Canal Breaches Litig.*, 495 F.3d at 205 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).") (citation and internal quotation marks omitted). However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

### III. DISCUSSION

After reviewing *de novo* the portions of the report and recommendation to which Scott & White has objected, the Court declines to adopt the report and recommendation. The choice-of-law analysis should consider both agreements Scott & White contends form one comprehensive contract with ARM. The Court also declines to adopt the report's analysis of the motion to dismiss under Texas law. Scott & White has pleaded sufficient facts to survive ARM's motion to dismiss.

*A. Choice of Law*

When hearing a case based on diversity jurisdiction, such as this one, the Court "must apply the substantive law of the forum state—including choice of law rules, which may dictate applying another state's laws." *Arthur W. Tifford, PA v. Tandem Energy Corp.*, 562 F.3d 699, 705 n.2 (5th Cir. 2009). In its motion to dismiss, (Dkt. 26), ARM argues, citing exclusively Texas law, that ARM is not

4

bound by privity with Scott & White—because ARM is not a party to the Hospital Agreement and Scott & White is not a party to the TPA agreement—and therefore Scott & White cannot bring a claim against ARM for breach of contract. In its response, (Dkt. 31), Scott & White raises the argument that Texas law permits two documents to be construed as one contract, even when they were signed at different times by different parties and do not expressly refer to one another. In its reply, ARM argues, for the first time, that Illinois law applies because the TPA Agreement contains an Illinois choice-of-law provision, and therefore Scott & White's Texas law-based argument is inapposite.[1] Scott & White's surreply disputes the contention that Illinois law should apply to its claim, arguing that (1) the Hospital Agreement contains its own choice-of-law provision, which states that Texas law governs, and (2) Texas law should apply to threshold question of whether the Hospital Agreement and the TPA Agreement can be read together as one contract.

In its response to the surreply, ARM confuses Scott & White's claim: it characterizes the contention as being whether Scott & White "can 'enforce' the TPA Agreement against ARM." (Resp. Surreply, Dkt. 38, at 3). If this were the extent of the claim, the proper course would be to analyze—as the report and recommendation does—whether the TPA agreement's Illinois choice-of-law provision governs under the Restatement (Second) of Conflict of Laws Section 188. *Sonat Expl. Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 231 (Tex. 2008). However, as Scott & White has made clear, that is not its argument. It contends that the two documents—the Hospital Agreement and the TPA—constitute one agreement, and therefore they may properly assert a claim against ARM for breach of contract.

---

[1] Typically, "[a]rguments raised for the first time in a reply brief are generally waived." *Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010). But here, Scott & White asked for and received the opportunity to file a surreply to address the new Illinois law-based arguments raised for the first time in ARM's reply. "It is well established 'that a district court may rely on arguments and evidence presented for the first time in a reply brief as long as the court gives the nonmovant an adequate opportunity to respond.'" *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 491 F. Supp. 2d 690, 704–05 (S.D. Tex. 2007) (quoting *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 292 n.10 (5th Cir.2004)). Therefore, ARM's contention that Illinois law applies is properly before the Court, and the report and recommendation properly considers it.

Scott & White and ARM agree that Texas law generally permits two documents executed by different parties at different times that do not refer to one another to be construed together as one contract, *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000) (noting that it is "well-established law that instruments pertaining to the same transaction may be read together to ascertain the parties' intent, even if the parties executed the instruments at different times and the instruments do not expressly refer to each other, and that a court may determine, as a matter of law, that multiple documents comprise a written contract"), while Illinois law generally does not, *e.g.*, *Illinois Hous. Dev. Auth. v. LaSalle Nat. Bank*, 487 N.E.2d 772, 776 (Ill. App. 1985) ("Two agreements executed by different parties cannot be regarded as one instrument.").

Each of the two agreements at issue—the Hospital Agreement (between Scott & White and Coventry) and the Third Party Administrator Agreement ("TPA Agreement") (between Coventry and ARM)—has a choice-of-law provision. The Hospital Agreement has a Texas choice-of-law provision, (HAS, Dkt. 26-1, ¶ 6.8), while the TPA Agreement states it is to be governed by Illinois law, (TPA, Dkt. 26-3, ¶ 6.14). The report and recommendation acknowledges this fact but finds, after conducting a choice-of-law analysis of the TPA Agreement alone, that Illinois law properly applies to the TPA. However, it does not address Scott & White's assertions that the analysis must also include the Hospital Agreement, which is governed by Texas law, and that the Texas law principle regarding reading separate documents together as a single agreement applies here.

It appears that the question of whether this Texas rule of contractual interpretation—permitting multiple documents signed by multiple parties at different times to be construed together as a single agreement—applies to two different documents, each of which states that a different state shall supply the law governing the contract, is one of first impression. However, the Court is not without guidance on this point. Cases show that Texas courts have found different documents to constitute the same agreement even when those documents have had conflicting provisions. *See, e.g.*,

6

*Baylor Univ. Med. Ctr. v. Epoch Grp., L.C.*, 340 F. Supp. 2d 749, 756 (N.D. Tex. 2004) (when reading two documents as one agreement, resolving conflicting provisions, noting that "[w]hen contractual provisions conflict, as here, they will be reconciled and harmonized whenever possible by any reasonable interpretation, so that the contract as a whole may be given effect").

Additionally, an Illinois case cited by ARM provides some guidance. In *Roche v. Zenith Insurance Co.*, No. 07-CV-0875-MJR-PMF, 2009 WL 635503 (S.D. Ill. Mar. 12, 2009), the federal district court of the Southern District of Illinois applied Illinois law to answer the same question at issue here—whether a hospital can hold a party liable for breach of contract when the parties signed documents that are interrelated but did so at different times. The court rejected the plaintiff's theory that the two documents constituted one agreement because "the theory of two separate agreements constituting a unified contract is unavailing under Illinois law." *Roche*, 2009 WL 635503, at *3. The court applied Illinois law to answer this question even though one of the documents at issue included a California choice-of-law clause. *Id.* at *4. This reasoning makes sense in light of the general rule that a federal court hearing a diversity case applies the law of the forum.

Additionally, Scott & White points to the action of a district court in Pennsylvania faced with a similar question on a motion to dismiss. The court found that, in determining which of two competing choice-of-law provisions should prevail, it would have to inquire into "the circumstances surrounding the execution of the various Agreements," *De Lage Landen Fin. Servs., Inc. v. Rasa Floors, LP*, No. 08-00533, 2009 WL 564627, at *5 (E.D. Pa. Mar. 5, 2009), a determination more appropriately undertaken at the summary judgment stage. The *De Lage* court could not "conclude at this stage that [one] choice-of-law provision" applies instead of the conflicting one. *Id.* The Court finds that here, as there, Scott & White "has alleged facts which, if true, may lead the Court to conclude that the Agreements could and should ultimately be construed together." *Id.* Texas law provides for the possibility that the agreements could be construed together if the right facts were

7

present. Therefore, granting the motion to dismiss on the basis that Illinois law applies would be premature.

*B. Texas Law Analysis*

The Court turns to whether these particular agreements can be construed together as one under Texas law. The parties' arguments on this point center on three cases—*Epoch*, 340 F. Supp. 2d at 749, *GPA Holding, Inc. v. Baylor Health Care Sys.*, 344 S.W.3d 467 (Tex. App.—Dallas 2011, pet. denied), and *Mem'l Hermann Health Sys. v. Coastal Drilling Co., LLC Employee Ben. Tr.*, 12 F. Supp. 3d 1001 (S.D. Tex. 2014)—involving this question in the context of a hospital suing over failure to pay claims for care it has provided pursuant to a Hospital Agreement. Scott & White contends that this case most closely resembles *Epoch* and *GPA*, each of which denies the defendant's motion for summary judgment. *Epoch*, 340 F. Supp. 2d at 751; *GPA*, 344 S.W.3d at 470 (upholding trial court's denial of summary judgment to defendant and grant of summary judgment to plaintiff). ARM argues that the case is more like *Coastal Drilling*, in which the Court granted the defendant's motion for summary judgment. *Coastal Drilling*, 12 F. Supp. 3d at 1003. The report and recommendation, siding with ARM, suggests that this case is more analogous to *Coastal Drilling* than it is to *Epoch* and *GPA*. (R. & R., Dkt. 96, at 16). The Court does not agree.

*Epoch* involved three main documents: (1) a Hospital Services Agreement between Baylor and Private Healthcare Systems, Inc. (PHCS), (2) a Subscriber Services Agreement between PHCS and Epoch, and (3) a Payor Acknowledgment between PHCS and Epoch. *Epoch*, 340 F. Supp. 2d at 751–52. In the Hospital Services Agreement, PHCS represented to Baylor that it had already entered into "Payor Acknowledgments with Payors for the use of the PHCS provider network," each of which "will obligate the Payor (or its designee) to comply with the duties and obligations of this Agreement, including, but not limited to, paying for Covered Services rendered to Members." *Id.* Accordingly, it had entered into a Payor Acknowledgment with Epoch, in which Epoch agreed to

"(i) pay or arrange to pay PHCS Preferred Providers in accordance with the PHCS Preferred Provider Agreement for such Preferred Provider; and (ii) comply with the applicable terms and conditions of the PHCS Preferred Providers Agreements." *Id.* The court agreed with Baylor's contention that "the Payor Acknowledgment expressly obligates Epoch to comply with the Hospital Services Agreement and to timely pay for medical services rendered to participants in the Plan," *id.* at 754, because, though executed at different times, "the instruments expressly refer to one another, showing an intertwined relationship between the parties and the instruments at issue." *Id.* at 755.

Similarly, in *GPA*, there were three main documents: (1) a Hospital Services Agreement between Baylor and PHCS, (2) a Subscriber Services Agreement between PHCS and GPA, and (3) a Subscriber Acknowledgment between PHCS and GPA. *GPA*, 344 S.W.3d at 471–72. As it had done in *Epoch*, PCHS, as a part of the Hospital Services Agreement, "warranted that its contracts with each Payor obligate the Payor (or its designee) to comply with the duties and obligations of the HAS, including, but not limited to, paying for Covered Services rendered to Members in accordance with the provisions of Article IV of the HSA." *Id.* at 472 (quotation marks and brackets omitted). This obligation was formed by a Subscriber Acknowledgment between GPA and PHCS, which required GPA to "pay or arrange to pay PHCS Preferred Providers . . . in accordance with the PHCS Preferred Provider Agreement for such Preferred Provider, for the markets and the networks for which GPA has purchased provider network Services from PHCS." *Id.* The court concluded that because of these circumstances, GPA was "bound by the HSA." *Id.* at 474.

Here, the contractual arrangement is strikingly similar. Scott & White entered into a Hospital Agreement with Coventry, under which Scott & White agreed to provide hospital services to Coventry network subscribers, in exchange for which Coventry agreed to bind its network subscribers ("the Payors") to pay for health care services in accordance with the Hospital Agreement's terms. (Am. Compl., Dkt. 18, ¶¶ 23–26). ARM entered into a Third Party

9

Administrator Agreement ("TPA Agreement") with Coventry,[2] through which ARM accessed Coventry's preferred health care provider network. (*Id.* ¶ 27). In doing so, ARM assumed the obligation to cause its Payors to pay Scott & White in accordance with the Hospital Agreement.

ARM takes issue with the fact that this contractual arrangement did not include a separate document—such as the Payor Acknowledgment in *Epoch* and Subscriber Acknowledgment in *GPA*—under which the Defendant agreed to be bound by the terms of the third-party intermediary's contractual arrangement with the plaintiff hospital. (Reply, Dkt. 33, at 8–9; *id.* at 10 ("There is no allegation or evidence that ARM executed any 'acknowledgement' or other document agreeing to comply with the Hospital Agreement.")). There may not be a separate document, but there does not need to be a separate document if ARM made the proper representations and promises in its agreement with Coventry, which is exactly what Scott & White alleges happened. (Am. Compl., Dkt. 18, ¶¶ 28–29). *Epoch* and *GPA* both happened to have Acknowledgments that were separate from the Subscriber Services Agreement, but the fact that they were separate was not dispositive; the two documents were both between the same parties (the defendant and PHCS), and were significant because of what they contained—a promise to be bound by the terms of the HSA—not because they were separate documents. *See GPA*, 344 S.W.3d at 474 (noting that the significance of the acknowledgments in both *Epoch* and *GPA* was "to commit the payor or subscriber 'to comply with the terms and conditions of the provider agreements,' so that provider discounts set forth in hospital services agreements could be extended to the subscriber's customers"); *Epoch*, 340 F. Supp. 2d at 755 ("The very foundation of the discounts offered in [the] Subscriber Services Agreement appears to be the agreements between PHCS and providers such as Baylor. Moreover, Payor Acknowledgments serve no apparent purpose other than to commit Payors to comply with the terms and conditions of the provider agreements."). Here, Scott & White has

---

[2] At the date of the contract, the entity that entered into the contract was called CCN Managed Care, Inc. (Am. Compl., Dkt. 18, ¶ 27 n.4).

adequately alleged that ARM made the same agreements in its TPA Agreement; the lack of a document titled "Subscriber Acknowledgment" is not dispositive.

In *Coastal Drilling*, meanwhile, the hospital stated that it was attempting to enforce an agreement—the Network Services Agreement—to which neither it nor the defendant were parties. The court there found the parties to be too far removed. There were four agreements linking Coastal Drilling to the hospital: (1) an Administrative Services Agreement between Coastal Drilling and Insurance Systems, Inc. (ISI), (2) a TPA Agreement between ISI and PPOplus, (3) a Network Access Agreement between PPOPlus and HSPC, and (4) a Hospital Service Agreement between HSPC and the hospital. *Coastal Drilling*, 12 F. Supp. 3d at 1005–06. The hospital sought to enforce the Network Access Agreement against Coastal Drilling, but neither the hospital nor Coastal Drilling were parties to the Network Access Agreement.

The *Coastal Drilling* court also found the contract network at issue significantly different from that in *Epoch* because there was "no evidence that Coastal Drilling Signed a 'Payor Acknowledgment' or similar contract that would bind it to the MHHS/HSPC Hospital Service Agreement or the PPOplus/HSPC Network Access Agreement." *Coastal Drilling*, 12 F. Supp. 3d at 1015; *see also id.* (distinguishing *Epoch* on the ground that there, a payor acknowledgment demonstrated that the contract should be read together because "Payor Acknowledgments serve no apparent purpose other than to commit Payors to comply with the terms and conditions of the provider agreements") (quoting *Epoch*, 340 F. Supp. 2d at 756). Because Coastal Drilling did not sign a document binding itself to the Hospital Service Agreement, and because the plaintiff in *Coastal Drilling* was attempting to enforce a contract against Coastal Drilling to which neither the plaintiff nor Coastal Drilling was a party, *Coastal Drilling* is distinguishable. Scott & White has therefore pleaded sufficient facts to state a claim for breach of contract against ARM.

## IV. CONCLUSION

For the foregoing reasons, ARM's motion to dismiss, (Dkt. 26), is **DENIED**. The Court declines to adopt the report and recommendation, (Dkt. 96).

**SIGNED** on March 27, 2018.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE